IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Nicolette Louise Johnson, )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>Carolyn W. Colvin, )<br>Commissioner of Social Security, )<br>)<br>Defendant. )<br>_____ ) | Civil Action No. 6:14-541-BHH-KFM<br><br>**REPORT OF MAGISTRATE JUDGE** |

This case is before the court for a report and recommendation pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.), concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).

The plaintiff brought this action pursuant to Section 205(g) of the Social Security Act, as amended (42 U.S.C. 405(g)) to obtain judicial review of a final decision of the Commissioner of Social Security denying her claim for disability insurance benefits under Title II of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

The plaintiff filed a prior application for disability insurance benefits ("DIB") in August 2008, alleging that she became disabled on August 23, 2008, due to a severe congenital heart condition resulting in heart valve replacement surgery in 2005, permanent use of anti-coagulation medicine, and permanent pacemaker implantation; chronic pain from degenerative disease of the cervical and lumbar spine; asthma and allergies; and hypertension (Tr. 150-52, 165, 216). The plaintiff's 2008 claim was denied initially and on reconsideration (Tr. 150-52).    The plaintiff withdrew her claim shortly before the administrative hearing because of difficulty in obtaining a written opinion from her treating cardiologist, Christopher D. Nielsen, M.D., an associate professor at the Medical University

of South Carolina ("MUSC") (Tr. 30-31, 165, 216).  An order of dismissal was entered on May 21, 2010 (Tr. 152, 216).

The plaintiff filed the instant DIB application on June 16, 2011, again alleging that she became unable to work on August 23, 2008.  The application was denied initially and on reconsideration by the Social Security Administration.  On March 9, 2012, the plaintiff requested a hearing.  The administrative law judge ("ALJ"), before whom the plaintiff and Robert E. Brabham, Jr., an impartial vocational expert, appeared on August 30, 2012, considered the case *de novo* and, on September 24, 2012, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended.  The ALJ's finding became the final decision of the Commissioner of Social Security when the Appeals Council denied the plaintiff's request for review on January 28, 2014.  The plaintiff then filed this action for judicial review.

In making the determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

> (1)    The claimant meets the insured status requirements of the Social Security Act through December 31, 2014.

> (2)    The claimant has not engaged in substantial gainful activity since August 23, 2008, the alleged onset date (20 C.F.R § 404.1571 *et seq*).

> (3)    The claimant has the following severe impairments: status-post aortic valve replacement, lumbar degenerative disc disease, and cervical degenerative disc disease (20 C.F.R. § 404.1520(c)).

> (4)    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526).

> (5)    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. § 404.1567(a) except

2

that she can occasionally bend, balance, stoop, crouch, crawl and kneel; can never climb; cannot reach overhead; and must avoid moderate exposure to fumes, gases, noxious odors, and all work hazards.

(6)    The claimant is unable to perform any past relevant work (20 C.F.R. § 404.1565).

(7)    The claimant was born on December 3, 1963, and was 44 years old, which is defined as a younger individual age 45-49[1], on the alleged disability onset date (20 C.F.R. § 404.1563).

(8)    The claimant has at least a high school education and is able to communicate in English (20 C.F.R. § 404.1564).

(9)    Transferability of job skills is not material to the determination of disability because applying the Medical-Vocational Rules directly supports a finding of "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

(10)    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. §§ 404.1569 and 404.1569(a)).

(11)    The claimant has not been under a disability, as defined in the Social Security Act, from August 23, 2008, through the date of this decision (20 C.F.R. § 404.1520(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and

---

[1]As the claimant is 44, she should be properly classified as a younger person, rather than a younger person age 45-49 (that could be considered of more limited ability due to age).  See 20 C.F.R. Section 404.1563(c).  The misclassification is of no consequence to the analysis here.

3

who are under a "disability." 42 U.S.C. § 423(a). "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment. 20 C.F.R. § 404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* § 404.1520(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62, 1982 WL 31386, at *3. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the

4

national economy that the plaintiff can perform despite the existence of impairments that prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. See *Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that the conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## **EVIDENCE PRESENTED**

### *Evidence Before the ALJ*

The plaintiff was 44 years old on her alleged disability onset date and 48 years old when the ALJ issued his decision. She has an associate's degree in medical coding and past relevant work experience as a health technician. She last worked in August/September 2008 at the Veterans Affairs ("VA") hospital and was terminated from

5

her job due to her inability to perform the job (Tr. 31-32, 176).  The plaintiff filed a complaint against the VA hospital because she was not offered another position that she possibly could have done, and she settled that claim for $5,000 (Tr. 176).

The plaintiff was born with a congenital heart defect and underwent patent ductus arteriosus ("PDA") repair surgery as a child (Tr. 649).  She required aortic valve replacement with a mechanical valve in 2005 and implantation of a permanent pacemaker due to complete heart block after the valve replacement (Tr. 649).

On January 9, 2008, the plaintiff went to the emergency room for mild chest pain complaints (Tr. 509).  Following an EKG, chest x-rays, and blood work, the plaintiff was diagnosed with atypical chest pain and discharged (Tr. 510-11, 546).

On January 17, 2008, the plaintiff began seeing Shailesh M. Patel, M.D., at Lowcountry Orthopaedics for evaluation of her neck and right upper extremity pain.  On examination, the plaintiff's cervical spine was symmetrical without kyphosis or scoliosis; there was mild tenderness to palpation in the cervical paraspinals; and her range of motion was normal.  The plaintiff's upper extremities were not tender to palpation.  The plaintiff walked with a normal gait; could toe and heel walk; her coordination was intact; her sensation was intact; her motor strength was 5/5 in her bilateral upper extremities; and her reflexes were symmetrical at 2+ for her upper extremities.  The plaintiff's muscle tone was normal with no clonus or atrophy.  Based on the plaintiff's history, physical examination, and the available imaging, Dr. Patel concluded that her pain complaints were radicular in nature. He recommended conservative treatment with anti-inflammatories and neuropathic pain medications, as well as further diagnostic testing with EMG and nerve conduction studies. He also suggested physical therapy and epidural steroid injections (Tr. 240-41).

The plaintiff returned to Dr. Patel in February with continued neck and right upper extremity pain complaints (Tr. 240).  On examination, the plaintiff walked with a normal gait and was able to toe and heel walk; her coordination and sensation were intact;

her motor strength was 5/5 in her bilateral upper extremities; and her reflexes were symmetrical at 2+ for her upper extremities. The plaintiff's muscle tone was normal without clonus or atrophy (Tr. 244). Dr. Patel recommended continued conservative treatment to include physical therapy, pain medications, and epidural steroid injections (Tr. 239).

In May 2008, Dr. Patel administered epidural steroid injections (Tr. 245-46). The following month, the plaintiff returned to Dr. Patel for her low back and left lower extremity pain (Tr. 235-38). Physical examination findings remained unchanged (Tr. 236). Dr. Patel noted that a CT scan of the plaintiff's lumbar spine dated June 7, 2008, revealed minimal degenerative disc changes at the L3-L4 level (Tr. 235). He administered EMG and nerve conduction studies to the plaintiff, which were normal and showed no evidence of chronic left lumbar radiculitis, generalized peripheral neuropathy, or focal nerve entrapment in either lower limb (Tr. 235, 248-52). Dr. Patel concluded that her pain symptoms were due to mild lumbar degenerative disc disease at the L3-L4 level, although her fibromyalgia could also be a contributing component. He recommended a lumbar epidural steroid injection, continued her prescription for Neurontin, and recommended physical therapy (Tr. 235).

On December 6, 2008, the plaintiff presented at the emergency room with chest pain complaints (Tr. 484). An EKG revealed an abnormal rhythm and abnormal P waves, but not atrial enlargement (Tr. 486). A chest x-ray revealed no acute disease (Tr. 487). The plaintiff was admitted to the hospital for further testing (Tr. 490).

On March 19, 2009, the plaintiff saw James Glenn, M.D., at MUSC Cardiology for a follow up appointment. Dr. Glenn reported some concern with the plaintiff's pacemaker, including an atrial lead impedance increase and an increase in mode switch events (Tr. 301). Two days later, the plaintiff presented at the emergency room with chest pain and facial swelling complaints (Tr. 474). The plaintiff had a CT scan of her chest, which was normal, and an EKG (Tr. 475, 537). The hospital attempted to reach Dr.

7

Nielsen, but he did not return the calls (Tr. 479).  The plaintiff was discharged home in a stable condition, but was advised to avoid strenuous activity and work for two days, and follow up with Dr. Nielsen (Tr. 480).

On June 12, 2009, the plaintiff was admitted to MUSC for one night to treat her intermittent, substernal chest pressure and pain complaints (Tr. 279, 318-20).  The plaintiff described the pain as nonradiating and not associated with any exertion (Tr. 279).  Although the plaintiff had shortness of breath, she had no nausea, vomiting, or diaphoresis.  An EKG showed no acute changes.  A chest x-ray was also normal and one set of cardiac enzymes was negative (Tr. 279, 534).

On June 15, 2009, the plaintiff had a coronary computed tomography angiogram ("CTA"), which showed no evidence of occlusion, stenosis, or aneurysm, as well as normal wall motion and regular function of the aortic valve prosthesis (Tr. 306-07).

On June 18, 2009, the plaintiff was again admitted to MUSC for one night for treatment of her chest pain complaints.  On examination, the plaintiff's heart had a regular rate and rhythm with a 2/5 systolic ejection murmur at the right upper sternal border (Tr. 314).  The plaintiff had chest x-rays, which showed no evidence of acute cardiopulmonary disease (Tr. 305, 533).  The following day, the plaintiff had adenosine myocardial perfusion imaging, which revealed normal myocardial perfusion and normal left ventricular function (Tr. 303).  Although the plaintiff stated that her pain was relieved with nitroglycerin, she did not take it due to the headaches it caused (Tr. 315).  The pain she was having was consistent with her baseline despite the episode of diaphoresis.  Although the pain was concerning, the treating physician concluded that they had ruled out ischemic causes for it several times.  The plaintiff was equipped with a Holter monitor, placed on a long-acting nitrate, and was discharged the following day after her pain was relieved and she was feeling better (Tr. 316).

8

On August 12, 2009, the plaintiff had a follow up appointment with Dr. Nielsen at MUSC Cardiology. Dr. Nielsen noted her recent hospitalization for chest pain. He reported that the diagnostic tests showed no coronary artery disease and that her most recent echocardiogram showed good ejection fraction and good functioning of the aortic valve prosthesis. Although the plaintiff continued to have some shortness of breath with exertion and occasional chest pain, she reported feeling better. Dr. Nielsen noted that there was some concern about some episodes of atrial fibrillation based on pacemaker interrogation, but he highlighted that this had happened in the past and was of brief duration. On examination, the plaintiff's oropharynx was clear; she had 2+ carotids without bruits; no jugular venous distention; and her heart rate and rhythm was regular with a II/IV systolic ejection murmur (faint but immediately audible sound generated by turbulent blood flow) (Tr. 299).

On February 10, 2010, the plaintiff told Dr. Nielsen that she was doing fairly well, although she had occasional episodes of chest pain approximately twice a month. The plaintiff reported generalized fatigue and shortness of breath when she really pushed herself. However, she stated that most of her symptoms had improved. She had an echocardiogram, which showed no major changes from her April 2009 echocardiogram (Tr. 285-86, 297-98).

In March 2010, the plaintiff was seen at MUSC Cardiology for a follow up appointment to evaluate her pacemaker. The plaintiff noted some fatigue, but was otherwise asymptomatic (Tr. 295).

On April 27, 2010, the plaintiff presented at the emergency room with low back pain and chest pain that had been present for five days. An EKG revealed no changes from the previous one; chest x-rays were normal; and lumbar spinal x-rays were negative. The plaintiff was given morphine and her symptoms improved. She was discharged with a prescription for Lortab (Tr. 427-31, 529-30).

9

On May 26, 2010, the plaintiff presented at the emergency room with chest pain complaints that started just prior to her arrival, but were relieved by the time she arrived at the emergency room (Tr. 414). The plaintiff also complained of neck and back pain (Tr. 422). The plaintiff was discharged in stable condition following an EKG, chest x-ray, which was normal, and blood work (Tr. 416-17, 528). She was given a prescription for Robaxir and Ultram (Tr. 423-24).

On July 24, 2010, the plaintiff went to the emergency room complaining of chest pain (Tr. 405). She was given an EKG, chest x-rays were taken, and blood tests were ordered. The plaintiff's EKG revealed normal sinus rhythm, normal P waves, and no acute ischemia (Tr. 406). Her chest x-rays showed no acute disease (Tr. 407, 527). The plaintiff was offered admission to the hospital, but stated that she would rather go home with pain medication and stated that back pain was actually the cause of her chest pain. The hospital concluded that the diagnosis of acute coronary syndrome was unlikely because she had no abnormal clinical findings. The plaintiff was discharged in good condition with no restrictions on her activity (Tr. 408-09).

On August 11, 2010, the plaintiff reported she was doing fairly well during her follow up appointment at MUSC. Although the plaintiff still occasionally had chest pain and shortness of breath, she was able to do normal activities most of the time without severe symptoms. Overall, the plaintiff was reasonably satisfied with how she felt (Tr. 293).

On November 9, 2010, the plaintiff was admitted to MUSC for non-radiating substernal chest pain with exertion and mild shortness of breath (Tr. 270). The plaintiff was found to have negative cardiac enzymes and no new ST changes on EKG (Tr. 275). A November 10, 2010, chest x-ray showed no evidence of acute cardiopulmonary disease (Tr. 302). On November 12, 2010, the plaintiff had a cardiac catheterization, which showed no significant coronary artery disease (Tr. 290-91). She was discharged that day with a diagnosis of atypical chest pain (Tr. 312).

10

A January 7, 2011, CT scan of the plaintiff's lumbar spine revealed no acute findings, no significant degenerative changes or disc bulges (Tr. 520). A CT scan of the plaintiff's cervical spine showed severe dorsal hyperostosis in the cervical canal, which was unchanged from the January 2008 scan, multilevel encroachment of the thecal sac in the midline, and possible cord impingement (Tr. 522).

On September 14, 2011, Adebola Rojugbokan, M.D., performed a comprehensive orthopedic examination at the request of the state disability determination service (Tr. 357). The plaintiff reported that she could stand for about one hour, sit for two to three hours, lift and carry about 15 pounds, ambulate effectively, and sustain a reasonable walking pace for one-quarter of a mile. The plaintiff reported that her ability to perform fine and gross movements, reach, grasp, and finger was normal, but she could not push or pull (Tr. 357-58). Dr. Rojugbokan did not have any medical records concerning the cardiovascular impairments and made no assessment of these medical problems other than to note that the plaintiff was status post open-heart surgery (Tr. 357, 362). With regard to the neck and back impairments, he noted limited range of motion and pain on palpation of the cervical spine (Tr. 355, 360). There was no heat, redness, crepitus, or malalignment of the articulating bones. The plaintiff had no atrophy, no subcutaneous nodules, and no skin changes (Tr. 360). Dr. Rojugbokan opined that the plaintiff was capable of walking, listening, seeing, hearing, and reasoning (Tr. 362).

On September 28, 2011, at the initial level, a non-examining state agency medical consultant, Mary Lang, M.D., assessed the plaintiff's residual functional capacity ("RFC") at the light exertional level. (Tr. 43-51).

On December 31, 2011, the plaintiff presented at the emergency room complaining of moderate muscle aches (Tr. 374). She was given an EKG and blood tests, diagnosed with myalgias, and discharged in a stable condition (Tr. 376).

11

On January 17, 2012, the plaintiff went to the emergency room for chest pain that was precipitated by light activity. The plaintiff described the pain as mild and relieved by nitroglycerin. An EKG was performed, which was normal, and chest x-rays revealed no acute disease (Tr. 369-70, 516). The plaintiff was transferred to MUSC in good and stable condition (Tr. 372). At MUSC, Amanda Redden Hathaway, M.D., concluded that the plaintiff's chest pain was atypical and, most likely, musculoskeletal in nature and related to her fibromyalgia. The plaintiff was given Flexeril and instructed to stretch the area. She was discharged with no restrictions on her activity and instructed to exercise for help with her fibromyalgia (Tr. 658-59).

On January 23, 2012, at the reconsideration level, another non-examining state agency medical consultant, Cleve Hutson, M.D., also assessed the plaintiff's RFC at the light exertional level (Tr. 54-63).

In March 2012, the pulse generator in the plaintiff's pacemaker was replaced, and she did well following the implant (Tr. 650, 662).

On April 2, 2012, Dr. Nielson wrote the following letter, which was submitted prior to the hearing before the ALJ:

> Nicolette Johnson has been my patient for over 10 years. She has a history of patent ductus arteriosus (PDA) repair as a child; pulmonary valve stenosis; pulmonary hypertension; bicuspid aortic valve, subsequently caused aortic stenosis requiring aortic valve replacement (AVR) with a St. Jude mechanical valve in 2005 with lifetime anticoagulation; permanent pacemaker due to complete heart block following AVR; history of deep vein thrombosis; hypertension; hyperlipidemia; non-coronary chest pain; pernicious anemia; fibromyalgia; cerebral vascular accident in 2011; and pancreatitis.
>
> Her physical exam reveals a regular heart rate and rhythm with and II/VI murmur consistent with history above and a mechanical S2, consistent with her mechanical valve replacement. Lungs reveal soft crackles in the left base. Her

12

blood pressure and heart rate are within normal limits. She [is] NYHA Class II-III[2] and is moderately to severely limited.

Due to the above cardiac diagnoses and NYHA classification, it is unlikely that she would be able to tolerate the physical demands of full-time work. She is unable to stand/walk for extended periods of time and she is unable to lift/carry anything over 8-10 lbs.

These conditions are not likely to improve, and may in fact worsen over time. It is highly unlikely that her cardiovascular is going to improve, and unlikely that her functioning is going to improve enough that she will be able to return to work under any conditions.

(Tr. 649).

At the hearing, the plaintiff testified that she lived a sedentary lifestyle, that she did not drive, and that she had episodes of increased chest pain and shortness of breath about three or four times a month requiring her to take nitroglycerin and sometimes go to the emergency room (Tr. 32-36). The nitroglycerin caused severe headaches that prevented her from getting back to normal activity for as long as a couple of hours, depending on the number of tablets she had to take (Tr. 35). She also experienced periodic episodes of sharp neck and back pain with stiffness, and on those days she usually

---

[2] According to the American Heart Association ("AHA"), the most commonly used classification system for heart failure is the New York Heart Association ("NYHA") Functional Classification, which places patients in one of four categories based on how much they are limited during physical activity. Under this classification, Class I heart failure encompasses "[p]atients with cardiac disease but resulting in no limitation of physical activity. Ordinary physical activity does not cause undue fatigue, palpitation, dyspnea or anginal pain." Class II heart failure encompasses "[p]atients with cardiac disease resulting in slight limitation of physical activity. They are comfortable at rest. Ordinary physical activity results in fatigue, palpitation, dyspnea or anginal pain." Class III heart failure encompasses "[p]atients with cardiac disease resulting in marked limitation of physical activity. They are comfortable at rest. Less than ordinary activity causes fatigue, palpitation, dyspnea or anginal pain." Class IV heart failure encompasses "[p]atients with cardiac disease resulting in inability to carry on any physical activity without discomfort. Symptoms of heart failure or the anginal syndrome may be present even at rest. If any physical activity is undertaken, discomfort increases." *See* AHA website (www.heart.org/HEARTORG/Conditions/ HeartFailure/ AboutHeartFailure/Classes-of-Heart-Failure_UCM_306328_Article.jsp#) (last visited April 23, 2015).

stayed in bed (Tr. 34).  The plaintiff testified that she was terminated by the VA Medical Center in September 2008 because she was no longer able to perform her job (Tr. 31).

The vocational expert testified a hypothetical person of the plaintiff's age, education, past work experience, and RFC would not be able to perform the plaintiff's past relevant work but could perform such occupations as telephone answering service worker, dispatcher, and order clerk (Tr. 37-38).  The vocational expert further testified that employers' customary tolerance for absences from work would be approximately one day per month (Tr. 39-40).  He also acknowledged that the plaintiff's testimony concerning the number of days each month during which she experienced a severe exacerbation of symptoms was in excess of the number of days of absenteeism tolerated by employers (Tr. 40).

### Appeals Council Evidence

The plaintiff submitted evidence to the Appeals Council, including Dr. Nielsen's answers to written interrogatories dated March 11, 2013 (Tr. 2, 220-28, 661-62). By notice and order dated January 28, 2014 (Tr. 1-7), the Appeals Council admitted into the administrative record treatment notes from Berkeley Medical Center dated April 2, 2012 (Tr. 661), and from MUSC dated May 3, 2012 (Tr. 662), but declined to admit Dr. Nielsen's 2013 opinion stating that it was "about a later time" (Tr. 2).  The Appeals Council returned Dr. Nielsen's opinion to the plaintiff and denied her request for review (Tr. 1-4).

### ANALYSIS

The plaintiff argues that (1)  the court should reverse and remand this case for consideration of new opinion evidence from Dr. Nielson; (2)  the ALJ erred in rejecting Dr. Nielsen's first opinion; (3)  the ALJ erred in failing to find that several of her impairments were severe and in failing to consider the combined effects of all her impairments; and (4) the ALJ erred in failing to evaluate the episodic exacerbation of her symptoms in the RFC assessment.

14

***Dr. Nielsen's 2013 Opinion***

As noted above, the Appeals Council declined to admit Dr. Nielsen's 2013 opinion in to the administrative record, finding that the evidence was "about a later time" and that it therefore "does not affect the decision about whether [the plaintiff was] disabled beginning on or before September 24, 2012" (Tr. 2).  The plaintiff argues that the case should be remanded to the ALJ for consideration of this evidence (pl. brief 17-20; pl. reply 1-7), and she filed a separate motion for sentence six remand (*see* doc. 20).  The plaintiff included Dr. Nielsen's March 2013 answers to her attorney's interrogatories, as well as the attorney's interrogatories, as an exhibit to the motion to remand (*see* doc. 20-1).  The first, second, and last paragraphs of the March 2013 opinion are identical to Dr. Nielsen's April 2012 opinion, which is set out in full above (*compare* doc. 20-1 *with* Tr. 649).  The only information in the second opinion that is not in the first opinion is the following:  the plaintiff could not perform "any type of work, including sedentary"; the plaintiff experienced cardiac symptoms on a daily basis even though she led a sedentary lifestyle; and Dr. Nielsen's conclusion that the plaintiff would be out of work two or more times per month (*compare* doc. 20-1 *with* Tr. 649).

"The Appeals Council must consider evidence submitted with a request for review in deciding whether to grant review 'if the additional evidence is (a)  new, (b) material, and (c)  relates to the period on or before the date of the ALJ's decision.' " *Wilkins v. Secretary of Dep't of Health & Human Servs.*, 953 F.2d 93, 95-96 (4th Cir. 1991) (quoting *Williams v. Sullivan*, 905 F.2d 214, 216 (8th Cir. 1990)).  Evidence is new "if it is not duplicative or cumulative" and is material if there is "a reasonable possibility that the new evidence would have changed the outcome." *Id*. at 96 (citing *Borders v. Heckler*, 777 F.2d 954, 956 (4th Cir. 1985)).  As the evidence at issue is not part of the record, any remand by this court would be pursuant to sentence six of 42 U.S.C. § 405(g), which permits remand for new evidence "only upon a showing that there is new evidence which is material and

that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding . . . ." 42 U.S.C. § 405(g).  Remand on the basis of new evidence is appropriate if:  1) the evidence is relevant to the determination of disability at the time the application was first filed; 2) the evidence is material to the extent that the Commissioner's decision might reasonably have been different had the new evidence been before him; 3) there is good cause for the claimant's failure to submit the evidence when the claim was before the Commissioner; and, 4)  the claimant made at least a general showing of the nature of the new evidence to the reviewing court. *Borders*,[3] 777 F.2d at 955 (citing 42 U.S.C. § 405(g)).

The undersigned finds that remand is not warranted for consideration of Dr. Nielsen's second opinion, which was written five months after the ALJ rendered his decision.  This evidence is not material to the extent that the decision might reasonably have been different if the evidence had been before the ALJ and it is not new as it is duplicative and cumulative of evidence in the record at the time of the ALJ's decision.  As an initial matter, Dr. Nielsen's conclusion that the plaintiff was not capable of "any type of work, including sedentary" (doc. 20-1 at 1) is a conclusion about her RFC, which is an issue expressly reserved to the Commissioner. *See* 20 C.F.R. § 404.1527(d) ("We will not give any special significance to the source of an opinion on issues reserved to the Commissioner . . . .") ; SSR 96-5p, 1996 WL 374183, at *5 (statements that a patient is "disabled" or "unable to work" or similar assertions are not medical opinions but rather are administrative findings reserved for the Commissioner's determination).

_____

[3]"Though the court in *Wilkins* [*v. Sec'y, Dept. of Health and Human Servs.*, 925 F.2d 769, 774 (4th Cir. 1991)] indicated in a parenthetical that *Borders*' four-part test had been superseded by 42 U.S.C. § 405(g), the Fourth Circuit has continued to cite *Borders* as the authority on the requirements for new evidence when presented with a claim for remand based on new evidence, and the U.S. Supreme Court has not suggested that the *Borders* construction of § 405(g) is incorrect." *Ashton v. Astrue*, C.A. No. TMD 09–1107, 2010 WL 3199345, at *3 n.4 (D. Md. Aug.12, 2010) (citing cases).  *See Elkins v. Astrue*, C.A. No. 4:10-2648-TER, 2012 WL 602779, at *4 n.3  (D.S.C. Feb. 24, 2012) (same).

16

As noted above, the only information in Dr. Nielsen's second opinion that is not in the first opinion is that the plaintiff could not perform "any type of work, including sedentary," that the plaintiff experienced cardiac symptoms on a daily basis even though she led a sedentary lifestyle, and the conclusion that the plaintiff would be out of work two or more times per month (*see* doc. 20-1). The ALJ specifically stated the following in his decision: "However, to the extent that Dr. Nielsen may maintain that the claimant is incapable of all work, I give little weight to such an opinion as it is inconsistent with her presentation upon routine examination and her own testimony regarding her activities of daily living" (Tr. 76). As argued by the Commissioner, given that Dr. Nielsen's second opinion only more emphatically opines that the plaintiff is incapable of any full time work, the ALJ has already explicitly stated that he gives such an opinion little weight. Accordingly, there is no likelihood that Dr. Nielsen's later opinion would have changed the outcome of the ALJ's decision. *See Evans v. Colvin*, C.A. No. 8:13-1325-DCN, 2014 WL 4955173, at *6 (D.S.C. Sept. 29, 2014) (holding that medical records were not material because it did not contain information that was not already before the ALJ and considered by the ALJ). Furthermore, Dr. Nielsen's conclusion that the plaintiff would be out of work two or more times per month is duplicative of the plaintiff's testimony. Specifically, the plaintiff testified that she had chest pain "episodes" three to four times a month that required her to take nitroglycerin, after which it would take her several hours to "get back to normal" (Tr. 35-36). Dr. Nielsen's statement that the plaintiff had "daily symptoms of shortness of breath with moderate exertion, as well as *daily chest pains that occur at rest and exertion that require nitroglycerin for relief*[,] which then leads to severe headaches" (doc. 20-1 at 1) (emphasis added) is contradicted by the plaintiff's testimony that she can go "for a couple of weeks" without any chest pain and that she has episodes requiring nitroglycerin three to four times a month (Tr. 35-36).

17

Based upon the foregoing, a sentence six remand for consideration of Dr. Nielsen's second opinion is not warranted.

**Treating Physician**

The plaintiff further argues that the ALJ failed to give good reasons for rejecting the first opinion of Dr. Nielsen. The regulations require that all medical opinions in a case be considered, 20 C.F.R. § 404.1527(b), and, unless a treating source's opinion is given controlling weight, weighed according to the following non-exclusive list: (1) the examining relationship; (2) the length of the treatment relationship and the frequency of the examinations; (3) the nature and extent of the treatment relationship; (4) the evidence with which the physician supports his opinion; (5) the consistency of the opinion; and (6) whether the physician is a specialist in the area in which he is rendering an opinion. *Id.* § 404.1527(c)(1)-(5). *See also Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005). However, statements that a patient is "disabled" or "unable to work" or similar assertions are not medical opinions. These are administrative findings reserved for the Commissioner's determination. SSR 96-5p, 1996 WL 374183, at *5.

The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case. *See* 20 C.F.R. § 404.1527(c)(2); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). Social Security Ruling ("SSR") 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion. 1996 WL 374188, at *5. As stated in SSR 96-2p:

> [A] finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. §§ 404.1527 and 416.927. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

18

*Id.* at *4.

As more fully set forth above, on April 2, 2012, Dr. Nielsen listed the plaintiff's diagnoses, her physical examination findings, and concluded that "it is unlikely that she would be able to tolerate the physical demands of full-time work." He further stated that the plaintiff could not stand or walk "for extended periods of time" and could not lift or carry more than eight to ten pounds (Tr. 649). The ALJ gave "significant weight" to Dr. Nielsen's opinion to the extent he opined that the plaintiff could perform sedentary work "as such an opinion is consistent with his own findings on examination and is well supported by the weight of the evidence of record." However, the ALJ gave the opinion "little weight" to the extent that Dr. Nielsen "may maintain that the [plaintiff] is incapable of all work." The ALJ found that such an opinion was inconsistent with the plaintiff's presentation upon examination and her testimony as to her daily activities (Tr. 76).

The ALJ's finding that the opinion was inconsistent with the other evidence of record, including her physical examination findings, is supported by substantial evidence (Tr. 76). *See* 20 C.F.R. § 404.1527(c)(3), (4) (stating that more weight is given to a medical source opinion that is supported by relevant evidence, particularly medical signs and laboratory findings, and that is consistent with the record as a whole). As argued by the Commissioner, although the plaintiff went to the emergency room repeatedly during the relevant time period for chest pain complaints and saw Dr. Nielsen for routine checkups, her physical examination findings and clinical findings were routinely benign. For instance, a March 2009 CT scan of the plaintiff's chest was normal, a June 2009 EKG showed no acute changes, and a June 2009 chest x-ray was normal (Tr. 279, 475). As noted by the ALJ, a June 2009 CTA of the plaintiff's heart showed no evidence of occlusion, stenosis, or aneurysm, as well as normal wall motion and regular function of the aortic valve prosthesis (Tr. 75; *see* Tr. 306-07). In the middle of June 2009, the plaintiff's heart had a

regular rate and rhythm with a 2/5 systolic ejection murmur at the right upper sternal border (Tr. 314). Other chest x-rays showed no evidence of acute cardiopulmonary disease (Tr. 305, 533). Also in June 2009, the plaintiff had adenosine myocardial perfusion imaging, which revealed normal myocardial perfusion and normal left ventricular function (Tr. 303). In August 2009, Dr. Nielsen noted that the plaintiff's diagnostic tests showed no coronary artery disease and that her most recent echocardiogram showed good ejection fraction and good functioning of the aortic valve prosthesis. Furthermore, the plaintiff reported feeling better. On examination, her oropharynx was clear; she had 2+ carotids without bruits; no jugular venous distention; and her heart rate and rhythm was regular with a II/IV systolic ejection murmur (299).

As noted by the ALJ, in February 2010, the plaintiff reported doing fairly well, and an echocardiogram showed no major changes (Tr. 75; *see* Tr. 297, 285-86, 298). The plaintiff was generally asymptomatic the following month (Tr. 295). In April 2010, an EKG revealed no changes from the previous one, and chest x-rays were normal (Tr. 428, 529-30). In July 2010, an EKG revealed normal sinus rhythm, normal P waves, and no acute ischemia, and chest x-rays showed no acute disease (Tr. 406-07, 527). Similarly, in November 2010, chest x-rays showed no evidence of acute cardiopulmonary disease, and a cardiac catheterization showed no significant coronary artery disease (Tr. 290-91, 302). In August 2010, the plaintiff reported she was doing fairly well, and she was reasonably satisfied with how she felt (Tr. 293). In September 2011, the plaintiff had an echocardiogram that revealed no major changes from the last exam (Tr. 364-65). The ALJ further noted that a January 2012 EKG was normal, and chest x-rays revealed no acute disease (Tr. 75; *see* Tr. 370, 516). The ALJ also highlighted that the plaintiff denied nausea, vomiting, difficulty breathing, or diaphoresis (Tr. 75; *see* Tr. 369). Also in January 2012, the plaintiff was informed that her chest pain could actually be musculoskeletal in nature and related to her fibromyalgia. There were no restrictions on her activity, and she

was encouraged to exercise (Tr. 658-59).  Given these benign clinical and examination findings, the ALJ properly reasoned that Dr. Nielsen's opinion that the plaintiff was incapable of all work was inconsistent with the other record evidence and was entitled to little weight for this reason (Tr. 76).

The ALJ also noted that the plaintiff's own statements regarding her activities of daily living also did not support Dr. Nielsen's opinion (Tr. 76).  For instance, the ALJ noted that the plaintiff filed a claim against the VA hospital after being terminated because the hospital failed to offer her another job that she thought that she could perform (Tr. 75; *see* Tr. 176), which undermined Dr. Nielsen's opinion that the plaintiff was incapable of all work.  Furthermore, the plaintiff reported that she is capable of washing her laundry, cooking easy meals, and shopping, and she enjoys reading, watching television, going to church, and visiting with her children (Tr. 190-92).

The ALJ also specifically noted that the opinions of the state agency physicians do not generally deserve as much weight as the opinions of examining or treating physicians, but their opinions are entitled to weight if they are supported by the medical evidence (Tr. 76). *See* 20 C.F.R. § 404.1527(e)(2)(i) ("State agency medical and psychological consultants . . . are highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation.  Therefore, administrative law judges must consider findings and other opinions of State agency medical and psychological consultants . . . as opinion evidence, except for the ultimate determination about whether you are disabled."). *See* SSR 96-6p, 1996 WL 374180, at *3 ("In appropriate circumstances, opinions from State agency medical . . . consultants . . . may be entitled to greater weight than the opinions of treating or examining sources."); *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir.1984) ("[T]he testimony of a non-examining, non-treating physician should be discounted and is not substantial evidence when totally contradicted by other evidence in the record. . . . [W]e have also ruled that the

21

testimony of a non-examining physician can be relied upon when it is consistent with the record.") (citations omitted).  Here, the ALJ gave the opinion of state agency physician Dr. Lang, who found that the plaintiff was capable of light work with some limitations, significant weight because it was supported by the evidence of record (Tr. 76; *see* Tr. 48-50).

Based upon the foregoing, th undersigned finds that the ALJ's assessment of Dr. Nielsen's opinion is based upon substantial evidence and is without legal error.

### Step Two

At step two of the sequential evaluation process, the ALJ found the plaintiff's following impairments to be severe: status-post aortic valve replacement, lumbar degenerative disc disease, and cervical degenerative disc disease (Tr. 73).  The plaintiff argues that the case should be remanded because the ALJ should have found her pacemaker implantation, deep vein thrombosis, hypertension, pulmonary valve stenosis with pulmonary hypertension, hyperlipidemia, non-coronary chest pain, pernicious anemia, cerebral vascular accident, and pancreatitis to be severe medically determinable impairments at step two (pl. brief 27).  For an alleged impairment to be found severe, the plaintiff must show that it is more than merely a "slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work . . . ." SSR 85-28, 1985 WL 56856, at *3.  The focus of the analysis must be on the limitations caused by the impairment, not the mere existence of an impairment.  Notably, the plaintiff fails to identify or point to any evidence of any functional limitations she experiences as a result of these conditions.  As argued by the Commissioner, the record shows that the plaintiff did not receive treatment for many of these conditions and did not experience any symptoms from them.  For instance, she worked after pacemaker implantation in 2002 and only stopped working in 2008 (Tr. 31, 295).  With regard to her chest pain, the ALJ clearly considered this condition throughout the entirety of his opinion as he discussed her emergency room visits relating to it and the physical examination

22

findings from those visits (Tr. 74-76).   Based upon the foregoing, the ALJ did not err in failing to find these conditions to be severe at step two of the sequential evaluation process.

***Residual Functional Capacity***

Furthermore, even assuming any of these impairments should have been considered severe, no reversible error occurred since the ALJ proceeded to the next steps of the sequential evaluation process and accounted for all of the plaintiff's credibly established functional limitations in the RFC findings. *See Washington v. Astrue*, 698 F. Supp. 2d 562, 580 (D.S.C. 2010) (holding that there is "no reversible error where the ALJ does not find an impairment severe at step two provided that he or she considers that impairment in subsequent steps").  The plaintiff argues that the ALJ failed to consider the combined effects of her impairments, including those that are not severe (pl. brief 27-29). When, as here, a claimant has more than one impairment, the ALJ must consider the severe and nonsevere impairments in combination in determining the plaintiff's disability. Furthermore, "[a]s a corollary, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments." *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). It "is axiomatic that disability may result from a number of impairments which, taken separately, might not be disabling, but whose total effect, taken together, is to render claimant unable to engage in substantial gainful activity.... [T]he [Commissioner] must consider the combined effect of a claimant's impairments and not fragmentize them." *Id.* (citing *Reichenbach v. Heckler*, 808 F.2d 309 (4th Cir.1985)).  The ALJ's duty to consider the combined effect of the plaintiff's multiple impairments is not limited to one particular aspect of its review, but is to continue "throughout the disability determination process." 20 C.F.R. § 404.1523.  As noted above, there is no evidence that the plaintiff's above-cited conditions caused any functional limitations and certainly none that would limit her further than the reduced range of sedentary work the ALJ found she was capable of performing. Furthermore, the ALJ specifically stated several times that he considered the combined

23

effects of the plaintiff's impairments, including her impairments that are not severe (Tr. 72, 74).  The ALJ noted that, when considered in combination, the plaintiff's impairments "fail to diminish her overall level of functioning any more than when her impairments are considered individually" (Tr. 74).

The plaintiff also argues that the ALJ failed to consider her headaches caused by nitroglycerin in assessing her RFC (pl. brief 29).  However, the record does not support a finding that these headaches were incapacitating and would functionally limit the plaintiff to the extent she alleges.  The ALJ's RFC assessment limited the plaintiff to a reduced range of sedentary work (Tr. 74).  The ALJ stated as follows in his RFC assessment: "Although the claimant's allegations of such significant limitations and pain were not fully consistent with the medical evidence of record, I accorded the claimant the benefit of the doubt and further reduced the [RFC] to include her limitations as described above" (Tr. 76). The record does not support additional limitations.   Notably, as argued by the Commissioner, the standard for disability under the Act is not that an individual must be pain free in order to be found not disabled. *See Welch v. Heckler*, 808 F.2d 264, 270 (3d Cir. 1986) (finding that an individual is not required to be pain free in order to be found not disabled).

The plaintiff further argues that the ALJ improperly ignored evidence of episodic exacerbation of her symptoms (pl. brief 23-27).  In his RFC assessment, the ALJ discussed the examination findings and diagnostic findings related to the plaintiff's heart condition (Tr. 74-75).  The ALJ also discussed in detail the results of the consultative orthopaedic examination by Dr. Rojugbokan (Tr. 75).  As discussed above, the ALJ was persuaded by the opinion of the state agency medical consultant, who opined that the plaintiff could perform a range of light work (Tr. 76).  The ALJ also considered the plaintiff's own testimony regarding her activities of daily living and the fact that she filed a claim

against her former employer premised on the assumption that she was capable of doing at least some work (Tr. 75).

The plaintiff's contention that she is incapable of working because of her episodic chest pains is not supported by the medical evidence. Although the plaintiff visited the emergency room repeatedly during the relevant time period, the clinical findings and examination findings that resulted from those visits did not substantiate her claims of debilitating pain. For example, during her emergency room visit in January 2012, the plaintiff described the pain as mild and noted that it was relieved by nitroglycerin (Tr. 369). An EKG was performed, which was normal, and chest x-rays revealed no acute disease (Tr. 370, 516). At MUSC, Dr. Hathaway concluded that the plaintiff's chest pain was atypical and, most likely, musculoskeletal in nature and related to her fibromyalgia (Tr. 658). The plaintiff was discharged with no restrictions on her activity and was instructed to exercise for help with her fibromyalgia (Tr. 659). Thus, although it is clear that the plaintiff visited the emergency room on many occasions on her own accord, the documented findings from those visits were unremarkable and do not support her claims of debilitating pain. *See Galino v. Comm'r of Soc. Sec.*, No. 6:08-cv-182-GJK, 2009 WL 890547, at *17 (M.D. Fla. March 30, 2009) (noting that the ALJ's decision denying benefits was supported by substantial evidence where there were numerous visits to the emergency room but the medical findings were benign).

Based upon the foregoing, the undersigned finds that the RFC assessment is based upon substantial evidence and is free of legal error.

## <u>CONCLUSION AND RECOMMENDATION</u>

Now, therefore, based upon the foregoing,

IT IS RECOMMENDED that the Commissioner's decision be affirmed and that

the plaintiff's motion for sentence six remand (doc. 20) be denied.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald
United States Magistrate Judge

April 30, 2015
Greenville, South Carolina